UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

| | |
|---|---|
| **LARRY DAY, et al.,**<br><br>    **Plaintiffs,**<br><br>V.<br><br>**FIRST NATIONAL FINANCIAL CORPORATION,** *dba* **First National Bank of Manchester,**<br><br>    **Defendant.** | CIVIL NO. 6:25-cv-52-KKC<br><br><br>**OPINION AND ORDER** |

*** *** ***

This matter is before the Court on the parties' motions for summary judgment (R. 13, 37, 38).

**I.    Background**

The parties do not disagree on many of the relevant background facts. All agree that scammers defrauded the plaintiffs (the "Days") out of nearly $300,000 in accounts they held at defendant First National Bank of Manchester. The parties also agree as to how the scam played out. The major disagreement between the parties is over whether the bank should be liable for the amount that the Days gave to the scammers. Except where noted, the summary of the facts below is derived from the Days' motion for summary judgment.

On October 15, 2024, scammers sent plaintiff Margaret Day an e-mail that falsely indicated the sender was PayPal. The email stated that there had been an unauthorized debit from her PayPal account in the amount of $589.32 linked to a purchase from Coin Base, Inc. (R.38-1 Day Dep. 7-8.) Even though Margaret did not have a PayPal account, she called the number on the email, and the person she spoke with told her the $589.32 had been debited from Day's checking account. (*Id.* at 12.) According to the Days' expert, at some point during

1

the interactions with Margaret, the scammers were able to upload a program to her computer called ScreenConnect/Connect Wise, which allowed them to access the Days' bank accounts at FNBM without her knowledge. (R. 38-2 Report 3.)

The Days have three accounts at FNBM that are at issue in this case: two savings accounts ("Savings Account 1" and "Savings Account 2") and one checking account (the "Checking Account"). After uploading the program that allowed remote access to these accounts, the scammers then made three electronic fund transfers among the three accounts. The first transfer was as follows:

- **First Transfer: On October 16, 2024, the scammers transferred $100,000 from Savings Account 1 to the Checking Account.**

Posing as the FNBM fraud department, the scammers then told Margaret to check the Checking Account because PayPal had erroneously deposited $100,000 into it. The scammers told her she would have to repay that amount to PayPal but instructed her not to simply transfer the money back to PayPal because the IRS would charge her 30 percent for that transaction. Instead, the scammers instructed her to make a personal investment, like purchasing gold, and give that to the scammers. (R. 38-5 Dep. 28-29.) In this way, the scammers instructed, she could avoid the 30 percent IRS fee.

On that same day – October 16, 2024 – the Days purchased the gold by wiring funds from their checking account to a gold dealer in Kingsport, Tennessee. They then traveled to Kingsport to pick up the gold. The next morning, the Days gave the gold to an individual who arrived at the Days' house with a mask on and in an out-of-state vehicle. (R. 38-8 Dep. 43.)

The scammers then made two additional transfers between the Days' accounts as follows:

- **Second Transfer: On October 17, 2024, the scammers transferred $100,000 from Savings Account 2 to Savings Account 1.**

- **Third Transfer: Also on October 17, 2024, the scammers transferred $200,000 from Savings Account 1 to the Checking Account.**

The scammers then informed Margaret that Paypal had again erroneously deposited money in her checking account, this time $200,000. Margaret once again wired money to the gold dealer, and she and Larry drove to Kingsport, Tennessee to pick up the gold, which they gave the next morning to an individual who came to their house.

In total, the Days paid $285,917.00 for the gold.

On October 22, 2024, the Days reported to FNBM what had occurred. They allege, however, that the bank "failed to perform a good faith investigation as required by the error resolution provisions" of the Electronic Fund Transfer Act (the "EFTA"), 15 U.S.C. §§ 1693 *et seq*.; refused to "recredit" their accounts for the money they lost; and "shirked its statutory duty to provide a written explanation of why it did not recredit their accounts." (R. 38 Motion 6.)

Thus, the Days appear to assert claims under two provisions of the EFTA. First, they claim that the bank must "recredit" their account for the value of the gold they gave to the scammers. (R. 27 Complaint ¶ 19.) For this claim, the Days presumably rely on a provision of the EFTA that provides that, with some exceptions that are not applicable here, "a consumer incurs no liability from an unauthorized electronic fund transfer." 15 U.S.C. § 1693g(e).[1] The Days assert that they lost the $ 285,917.00 "as a direct and proximate result of the unauthorized transfers and/or breach of the duties imposed upon" FNBM. (R. 27 Complaint ¶ 19.)

---

[1] While the Days do not cite § 1693g(e) in their complaint or briefs, they do cite § 1693g(b), which sets forth the burden of proof for actions involving consumer liability for unauthorized electronic fund transfers. (*See* R. 23 Response 21; R. 38 Motion 7.) The Days also assert in their complaint that the FNBM had a duty to credit their account "in the amount of the unauthorized transfers. . . ." (R. 27 Complaint ¶ 18.) Finally, in their briefs, they cite case law holding that, "financial institutions subject to the EFTA must reimburse their customers for unauthorized transactions regardless of fault, except in limited circumstances." *Michigan First Credit Union v. T-Mobile USA, Inc.*, 108 F.4th 421, 424 (6th Cir. 2024).

3

Second, the Days assert a claim that the bank breached its "duty to investigate the alleged error, determine whether an error had occurred, and report or mail the results of such investigation and determination to its consumers . . . within ten (10) business days." (R. 27 Complaint ¶ 18.) For this claim, the Days rely on 15 U.S.C. § 1693f and the EFTA's implementing regulations known as "Regulation E." 12 C.F.R. § 1005 *et seq*.

The Days assert that FNBM's investigation of the errors in their accounts violated the EFTA in two ways: First, the bank failed to conduct a "good faith investigation" of the alleged error in their accounts and, second, the bank failed to provide them with a written report after its investigation. (R. 38 Motion 23-25.)

## II. Analysis

### A. The reimbursement claim under § 1693g(e)

Congress explicitly stated in the EFTA that its "primary objective . . . is the provision of individual consumer rights." 15 U.S.C. § 1693(b). As one court has explained, "the 1978 Congress that enacted the EFTA was almost singularly concerned with consumer protection in the face of rapid technological change in electronic payment mechanisms." *New York by James v. Citibank, N.A.*, 763 F. Supp. 3d 496, 518 (S.D.N.Y. 2025), *motion to certify appeal granted*, No. 24-CV-659 (JPO), 2025 WL 1194377 (S.D.N.Y. Apr. 22, 2025). "Congress was concerned that consumers would not understand the technologies they were using and would be susceptible to sophisticated frauds as a result, and it determined that financial institutions were better positioned to shoulder the risk of those frauds." *Id*. at 519. The court concluded, "it is clear that the statutory purpose of the EFTA was to protect consumers from sophisticated, technological frauds." *Id*. Thus, the EFTA requires that banks "reimburse their customers for unauthorized transactions regardless of fault, except in limited circumstances." *Michigan First Credit Union*, 108 F.4th at 424.

4

An "unauthorized electronic fund transfer" means, with some inapplicable exceptions, "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." 15 U.S.C. § 1693a(12). The FNBM has argued in the briefs before the Court that the Days received some benefit from the transfers. Thus, the Days understandably spend a good portion of their motion for summary judgment arguing that they did not receive a benefit from the unauthorized transfers. In response to the Days' motion for summary judgment, however, FNBM explicitly and repeatedly states it does not argue that the Days received a benefit from the unauthorized transfers between accounts. (R. 40 Response 10, 11, 13.) It states it is "not making that argument at all." (*Id.* at 11.) In the briefs before this Court, FNBM does not dispute that the three electronic transfers were initiated by someone other than the Days. Thus, under the EFTA, the three transfers were unauthorized electronic fund transfers, and the Days should incur no liability from them.

The liability the Days incurred from the unauthorized transfers, however, is miniscule, totaling only the interest the Days lost when amounts in their savings accounts were transferred to the Checking Account for several days. The Days have not claimed this interest in damages, nor have they produced evidence as to how much they lost in interest. After the unauthorized transfers, the Days retained possession of the $ 400,000 involved in the transfers; the funds were just transferred from one of the Days' accounts to another. The Days did not lose possession of any funds in their accounts until Margaret went to the bank and wired funds from the Checking Account to a gold dealer in Kingsport, Tennessee, traveled to Kingsport to pick up the gold, and then gave the gold to an individual.

This case is very similar to a recent case before the district court in Maine. *Vitalis v. cPort Credit Union*, No. 2:25-CV-00217-LEW, 2026 WL 207156, at *1 (D. Me. Jan. 27, 2026). There too, the plaintiff was the victim of a scam by individuals purporting to be with PayPal.

5

The plaintiff permitted the scammers to install software on her computer, which gave the scammers remote access to her accounts with the bank. There too, the scammers transferred money among the plaintiff's accounts so that it ultimately appeared as if PayPal had inadvertently deposited a large sum of money into the plaintiff's checking account when, in fact, the money came from the plaintiff's own accounts. Plaintiff agreed to withdraw the money from her account and return it to PayPal by depositing it into an ATM machine as the scammers instructed. Like the Days' case, the scammers repeated the same fraud with the same plaintiff a couple of days later.

The plaintiff in *Vitalis* sought to recover the amounts she herself had withdrawn and deposited into the ATM machine. The Court determined, "While I agree with Plaintiff that the electronic fund transfers at issue in this case were unauthorized, the subsequent withdrawals of cash and deposits in the ATM were Plaintiff's own acts and, ultimately, the essential cause of her loss." *Id*. at *5. Accordingly, "recovery for such a loss is not available through the EFTA." *Id*.

All can agree that what happened to the Days is horrifying and tragic. As this Court has witnessed, such scams happen all too frequently to hardworking people in this modern world of remote financial transactions and communications. The Court's role on this reimbursement claim, however, is very limited. It must look at the language of the statute and determine whether it provides that the bank is liable for the Days' claimed losses. As explained, by its plain language the statute does not impose liability on the bank for the over $285,000 of losses claimed by the Days. Those losses came not from the unauthorized transfers but from Margaret's actions in wiring the funds from her account to the gold dealer.

The bank would be liable under the EFTA only for any losses suffered from the three unauthorized transfers between the Days' accounts. The Days have not, however, claimed or proved any such losses.

### B. The Investigation Claim under § 1693f and Regulation E

As to the Days' claim that the FNBM failed to properly investigate the alleged errors in their accounts in violation of 15 U.S.C. § 1693f(a), the Days assert they are entitled to treble damages under the EFTA, which provides that a consumer is entitled to treble damages if the court finds that:

> (1) the financial institution did not provisionally recredit a consumer's account within the ten-day period specified in subsection (c), and the financial institution (A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error; or
>
> (2) the financial institution knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation . . . .

15 U.S.C. § 1693f(e).

An "error", for purposes of this provision, includes "an unauthorized electronic fund transfer." 15 U.S.C. § 1693f(f)(1). The unauthorized electronic fund transfers that the Days rely on for this claim are the three transfers totaling $400,000 between their accounts that were made by the scammers unbeknownst to the Days. The Days complain that the bank did not conduct a "good faith" investigation of these transfers.

Even if the bank's investigation was not in "good faith," however, the Days have produced no evidence of any damages they incurred as a result. The EFTA provides that "the consumer shall be entitled to treble damages determined under section 1693m(a)(1) of this title." 15 U.S.C. § 1693f(e). Section 1693m(a)(1) provides for only actual damages that a consumer sustains as a result of the bank's failure to comply with the statute. Three times zero is zero.

7

The EFTA also allows, however, for statutory damages of a minimum of $100 and a maximum of $1,000 for an "individual action." 15 U.S.C. § 1693m(a)(2)(A). If the bank failed to comply with "any provision" of the EFTA, it is liable for statutory damages to "any consumer." This is true here even though the bank was not liable for the amounts that Margaret wired from her account to the gold dealer and even though the bank had no liability for the three unauthorized transfers that did occur. *See Vitalis*, 2026 WL 207156 at *5.

As to the bank's duty to investigate, summary judgment on the reasonableness of an investigation is proper only if the evidence supports only one conclusion. *See Gazdhyan v. Chime Fin., Inc.,* No. 2:24-CV-10575-DSF-SSCX, 2025 WL 3650185, at *3 (C.D. Cal. Dec. 4, 2025) (applying reasonableness standard to a failure-to-investigate claim under § 1693f); *Green v. Cap. One, N.A.*, 557 F. Supp. 3d 441, 450 (S.D.N.Y. 2021) (same).

On October 22, 2025, the Days informed FNBM President and CEO Luke Shepherd of what had occurred. (R. 38-11 Dep. 191.) FNBM auditor Morgan Bargo investigated the transfers between the Days' accounts and determined that they occurred through the bank's online banking system by someone who used the Days' username and password. (R. 37-2 Dep. 19.) Bargo recalled Margaret explaining that she believed that PayPal had inadvertently deposited a total of $300,000 into the Days' checking account, but the Days had later discovered that the money came from their own savings account. (R. 37-2 Dep. 17-19.) Bargo testified that Margaret said she had been in contact with somebody from PayPal and someone who Margaret thought was with the bank's fraud department. Margaret said the person who she thought was with the bank "helped her with her account" and "they watched her log into her account." (R. 40-2 Dep. 32.) Bargo surmised that Margaret had given her login credentials to that person and that is how the transfers occurred. (R. 40-2 Dep. 33.)

The Days have produced evidence that the transfers did not occur by Margaret giving her login credentials to someone else. The Days' expert Johnie J. Karr states in his report that

8

the scammers used a program called ScreenConnect/Connect Wise to remotely access the Days' computer to make the unauthorized transfers between the Days' accounts. (R. 38-3 Report.)

While the bank did not need to examine the Days' computer as the expert did to comply with its investigatory duties under the EFTA, a reasonable juror could find the bank's investigation was lacking because of its seeming failure to ask Margaret more about her interactions with the scammers, who were posing as Paypal and the bank's fraud department. It appears that, after Bargo determined the Days' login credentials were used to complete the transfers, Bargo simply "surmised" that Margaret gave the credentials to a third party. (R. 40-2 Dep. 33.) From that, the bank determined that the Days had "consented to the transaction" (R. 40-2 Dep. 29) and that the transaction was "valid" (R. 40-2 Dep. 21.) The bank also concluded that the Days somehow benefited from the transfers. (R. 40-2 Dep. 21, 24, 29.) With those two conclusions, the bank appears to have ended its investigation of the electronic fund transfers. Whether that was reasonable is a question for the jury. Accordingly, the Court will not grant either party summary judgment on the Days' claim that the bank failed to properly investigate the errors they reported in their accounts.

As to the bank's report to the Days, the bank orally reported the results of its investigation to the Days on the same day the Days informed the bank of the errors – October 22, 2024. (R 38-23 Response to Request No. 1; R. 38-24 Dep. 132-33.) The Days argue that the report must be in writing. The statute itself does not specify whether the report must be in writing. Regulation E, however, clarifies that, if the financial institution determines that no error occurred in the consumer's accounts, then "the institution's report of its investigation shall include a written explanation of the institution's findings and shall note the consumer's right to request the documents that the institution relied on in making its determination. Upon request, the institution shall promptly provide copies of the documents." 12 C.F.R. § 1005.11(d).

9

FNBM does not argue that the Days cannot enforce Regulation E. "Plaintiffs have successfully enforced Regulation E in federal court for years." *Virginia is for Movers, LLC v. Apple Fed. Credit Union*, 720 F. Supp. 3d 427, 440 (E.D. Va. 2024).

There is no dispute that the bank did not provide the Days a written report after its investigation. Accordingly, the Court will grant the Days' motion for summary judgment on its claim that the bank failed to send them a written report after having determined that no error occurred.

### III. Conclusion

For all these reasons, the Court hereby ORDERS as follows:

1) The first motion for summary judgment (R. 13) by FNBM is GRANTED in part and DENIED in part as follows:

    a. The motion is GRANTED as to the claim by the Days that the bank is liable for the amounts that the Days wired from their account to the gold dealer in Kingsport, Tennessee. Judgment will be entered in the bank's favor on that claim.

    b. The motion is DENIED as to the claim for statutory damages by the Days for the bank's alleged failure to properly investigate the three electronic transfers between their accounts and to provide them a written report after the investigation.

2) The motion for summary judgment (R. 38) by the Days is GRANTED in part and DENIED in part as follows:

    a. The motion is DENIED as to the Days' claim that FNBM is liable for the amounts that the Days wired to the gold dealers in Kingsport, Tennessee and their claim that the bank's investigation was not reasonable.

10

    b. The motion is GRANTED as to the Days' claim that they are entitled to statutory damages for the bank's failure to provide them with a written report after determining that the three electronic transfers were valid and not errors. Judgement will be entered in favor of the Days on this claim.

3) The second motion for summary judgment (R. 37) by FNBM, which is based on the bona fide error defense, is DENIED as moot because FNBM asserts the defense to the unauthorized electronic transfers, but the Days do not claim that the bank is liable for those transfers.

\* \* \* \* \* \* \* \*

This 13th day of February, 2026.

**Signed By:**

*Karen K. Caldwell* KKC

**United States District Judge**